IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JOSLYN M. JOHNSON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. H-10-366 |
| | § | |
| HAROLD HURTT, *in his official* | § | |
| *capacity as Chief of Police of the* | § | |
| *Houston Police Department*, THE | § | |
| CITY OF HOUSTON, *and* | § | |
| HOUSTON POLICE | § | |
| DEPARTMENT, | § | |
| | § | |
| Defendants. | § | |

## ORDER

Pending before the Court is Defendant The City of Houston's Motion to Dismiss (Document No. 44). Having considered the motion, submissions, and applicable law, the Court determines that the motion should be granted.

## I. BACKGROUND

Plaintiff Joslyn Johnson brings this case pursuant to 42 U.S.C. § 1983 alleging violations of various constitutional and federal rights. Plaintiff is a Sergeant in the Houston Police Department and the widow of former Houston Police Officer Rodney Johnson, who was tragically shot and killed by an illegal alien during a routine traffic stop in 2006. On September 21, 2009, Johnson commenced this suit in the 151st Judicial District Court of Harris County, Texas, against the City of Houston (the

"City"), the Houston Police Department ("HPD"), and then-acting Chief of Police Harold Hurtt ("Chief Hurtt") (collectively, "Defendants"). On February 8, 2010, the Defendants removed the case to federal court based on federal-question jurisdiction. The case was assigned to U.S. District Judge Kenneth Hoyt, who on September 30, 2010, issued an order of dismissal finding that Plaintiff's claims against the City were barred under principles of *res judicata* by a previous case Plaintiff had filed against the City alleging similar claims.[1]  Before dismissing Plaintiff's claims against the City, the district court dismissed HPD as a party on the grounds HPD lacked the legal existence and capacity to be sued under Federal Rule of Civil Procedure 17(b).  The district court further denied Plaintiff's motion to substitute Charles McClelland Jr.—the City's acting Chief of Police—in place of retired Chief Hurtt.  Finally, the district court dismissed Chief Hurtt in his official capacity on the grounds that the court lacked jurisdiction to issue a mandamus against Chief Hurtt and that Plaintiff's § 1983 claims against Chief Hurtt in his official capacity were redundant since the Plaintiff had also asserted the same claims against the City.

---

[1] The previous case Plaintiff filed against the City also originated in state court.  It was removed to federal court and assigned to U.S. District Judge Sim Lake.  *See Johnson v. City of Houston*, H-08-3770 ("*Johnson I*").  There, Plaintiff sued the City in her capacity as executrix of her husband's estate and alleged similar, although not identical, claims to those in the present case.  Judge Lake dismissed Plaintiff's § 1983 claims under Rule 12(b)(6) and remanded the remaining state-law claims to the originating state court.

On November 1, 2010, Plaintiff filed an appeal with the United States Court of Appeals for the Fifth Circuit challenging the district court's finding on the issue of *res judicata*. Plaintiff did not challenge the portions of the district court's order dismissing HPD or Chief Hurtt. On October 6, 2011, the Fifth Circuit issued an opinion reversing the district court's order on the grounds that the present action did not meet the test for claim preclusion under Fifth Circuit precedent.[2] Consequently, the Fifth Circuit remanded the case to the district court for further proceedings. On October 12, 2011, case was reassigned to this Court following Judge Hoyt's recusal.

On November 15, 2011, Plaintiff filed her Second Amended Complaint, wherein she renamed HPD and the City's acting Chief of Police, Charles McClelland ("Chief McClelland"). According to her Second Amended Complaint, Plaintiff challenges certain policies maintained by Defendants, which she alleges substantially restrict, if not prohibit, her from communicating with U.S. Immigration and Customs Enforcement ("ICE") about matters concerning the status of undocumented aliens and those who are criminally present in the United States as undocumented aliens. The

---

[2] Specifically the Fifth Circuit held that claim preclusion did not apply because in the present case, Johnson sued in her individual capacity for violations of her own civil rights, as opposed to suing in her capacity as executrix of her husbands's estate, as was alleged in *Johnson I. See Johnson v. City of Houston*, 444 F. App'x 26, 32–33 (5th Cir. 2011).

3

policies at issue are HPD General Order 500-05 (issued on June 25, 1992) and HPD

Circular 06-1010-298 (issued on October 11, 2006).

HPD General Order 500-05 states in relevant part as follows:

> POLICY
>
> Undocumented aliens status is not, in itself, a matter for local police action. Unlawful entry into the United States is not to be treated as an on-going offense occurring in the presence of a local police officer. Houston police officers may not stop or apprehend individuals solely on the belief that they are in this country illegally.
>
> PROCEDURES
>
> Officers shall not make inquires as to the citizenship status of any person, nor will officers detain or arrest persons solely on the belief that they are in this country illegally. Officers will contact [ICE] regarding a person only if that person is arrested on a separate criminal charge (other than a class C misdemeanor) and the officer knows the prisoner is an illegal alien.[3]

The purpose of General Order 500-05 is "to establish the policy of the Houston

Police Department regarding illegal aliens."[4] Circular No. 06-1010-298 supplements

and further clarifies General Order 500-05. It states in relevant part as follows:

---

[3] General Order 500-05, Houston Police Department, June 26, 1992 (Exhibit 2 to Plaintiff's Second Amended Complaint, ECF No. 37).

[4] *Id.*

1.     Officers will <u>NOT</u> detain or arrest persons solely on the suspicion that they are in this country illegally.

2.     Officers have the discretion to check the wanted status of any one legally detained.

3.     Officers <u>SHALL</u> check the wanted status of everyone that is ticketed, arrested, and/or jailed . . . .

4.     Officers who receive an NCIC Immigration Hit (Criminal Enforcement of Administrative Warrant of Removal and/or ICE Detainer on Previously Deported Felons) will confirm the information as instructed within the NCIC Hit.  Persons with confirmed hits from the Bureau of Immigration and Customs Enforcement (ICE) will be handled as a fugitive hold

. . . .

c)     Officers will have direct contact with the Law Enforcement Support Center (LESC) at a 1-800 number dedicated exclusively to law enforcement and advise them of the NCIC information hit.  Once the identity of the person and the warrant or detainer are confirmed, ICE will be contacted for acceptance of a criminal hold on the suspect by our Dispatch and/or Jail Division.

. . . .

9.     Undocumented aliens are prohibited from possessing firearms and can be charged federally with a felony pursuant to Title 18, United States Code, section 922(g)(5). The Harris County District

> Attorney's Office has agreed to refer these cases to the U.S. Attorney's Office for prosecution. Anyone encountering an undocumented alien in possession of a firearm should place them on hold for the Major Offenders Division so that they can be prosecuted federally.
>
> . . . .[5]

Plaintiff alleges that under these policies, officers have the *discretion* to check the "wanted" status of any person legally detained, and that officers are *required* to check the "wanted" status of any person ticketed, arrested, or jailed. She explains that "wanted" checks are performed by running a person's name through various computer databases such as the National Crime Information Center ("NCIC") database.[6] She alleges that under these policies, officers are barred from contacting ICE directly unless an officer's "wanted" check produces an "NCIC Immigration Hit" indicating that a detained person is the subject of an outstanding ICE-issued warrant. Only then may an officer contact ICE directly to confirm the person's identity, the existence of

---

[5] Circular No. 06-1010-298, Houston Police Department, October 10, 2006 (Exhibit 3 to Plaintiff's Second Amended Complaint, ECF No. 37).

[6] The NCIC database "is a computerized index of criminal justice information (i.e.-criminal record history information, fugitives, stolen properties, missing persons). It is available to Federal, state, and local law enforcement and other criminal justice agencies and is operational 24 hours a day, 365 days a year. . . . Data contained in NCIC is provided by the FBI, federal, state, local and foreign criminal justice agencies, and authorized courts." National Crime Information Center (NCIC) - FBI Information Systems, http://www.fas.org/irp/agency/doj/fbi/is/ncic.htm.

the warrant or detainer, or confirm the information that the "NCIC Immigration Hit" may contain.

Plaintiff contends, however, that ICE maintains different information relating to the identify and immigration status of undocumented aliens, which the NCIC database does not contain or emphasize. She explains that the NCIC database only houses identity information on aliens previously convicted and deported for drug trafficking, firearms trafficking, or serious violent crimes, and that identity information on aliens deported for other reasons is not included. She further explains that ICE, by contrast, maintains a comprehensive system that collects citizenship and immigration information from a wide range of databases, including the NCIC database, and that such information is made available to other law enforcement agencies through the Law Enforcement Support Center ("LESC"), a single national point of contact that operates 24 hours a day, seven days a week, to provide timely customs information and immigration status and identity information to local, state, and federal law enforcement agencies on aliens suspected, arrested, or convicted of criminal activity. Thus, Plaintiff alleges that by limiting her to checking only the "wanted" status, through the NCIC database, of a person who is lawfully detained, ticketed, arrested, or jailed, the subject policies substantially restrict her ability to obtain information from ICE on the person's immigration status, whether legal,

illegal, or criminal. She further alleges that even when a person's immigration status is or becomes known by her, such as if a person identifies himself or herself as an undocumented alien or a previously deported alien, the policies restrict her ability to report that information to ICE or to contacted ICE "while on the street" unless that person is arrested, or otherwise legally detained.

Plaintiff contends that she does not seek to detain or arrest persons in order to make inquires into their immigration status; rather, she seeks to use her own professional judgment to determine when it is appropriate to contact ICE to inquire or provide information about a person's immigration status if, in the course of carrying out her duties and responsibilities as a law enforcement officer, she has reason to believe a crime may have been committed. She alleges that subject policies prohibit such communications and harm her ability to carry out her duties and responsibilities as a law enforcement officer. She further alleges that subject policies deprive her of her rights, privileges, and immunities guaranteed by the United States and Texas constitutions, including her right to freedom of expression, and that these policies further violate her federal rights under 8 U.S.C. § 1373 (communication between government agencies and the Immigration and Naturalization Service) and 8 U.S.C. § 1644 (communication between State and local government agencies and Immigration and Naturalization Service). Consequently, Plaintiff seeks to bring an

end to the Defendants' current policies and compel Defendants to comply with federal laws, rules, and regulations, so that she and others may communicate with ICE.  To do so, Plaintiff seeks the following forms of relief: (1) a writ of mandamus against the City's Chief of Police directing him to refrain from violating 8 U.S.C. § 1373 and § 1644 by prohibiting or restricting Plaintiff from contacting ICE to obtain immigration status of persons she lawfully encounters; (2) a declaration that HPD General Order 500-05 and HPD Circular 06-1010-298 are unlawful and void; (3) a permanent injunction enjoining the Defendants from enforcing or continuing the challenged policies; and (4) costs and attorney's fees.

The City move to dismiss Plaintiff's Second Amended Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  The City re-urges its arguments made in its initial motion to dismiss concerning HPD and the City's Chief of Police. Additionally, the City contend that Plaintiff's claims under § 1983 and the Texas Constitution fail to state a claim for which relief can be granted.  Plaintiff has responded and is opposed.

## II. STANDARD OF REVIEW

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief may be granted." FED. R. CIV. P. 12(b)(6). Under Rule 8(a)(2), a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled

to relief." FED. R. CIV. P. 8(a)(2). Although "the pleading standard Rule 8 announces does not require 'detailed factual allegations,' "it demands more than 'labels and conclusions.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "'[A] formulaic recitation of the elements of a cause of action will not do.'" *Id.*

In deciding a Rule 12(b)(6) motion to dismiss for failure to state a claim, "[t]he 'court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *In re Katrina Canal Breeches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)). To survive the motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "Conversely, 'when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Twombly*, 550 U.S. at 558).

### III.  LAW & ANALYSIS

#### A.    *Plaintiff's Claims Against HPD*

Plaintiff has sued HPD in this suit because she alleges it maintains and enforces the policies she alleges violate her rights.  The City moves to dismiss Plaintiff's

claims against HPD contending that HPD, as a department within the City, lacks the legal existence and capacity to be sued. Plaintiff maintains, however, that because HPD has actively litigated numerous lawsuits in the past, as a plaintiff, a defendant, and even an appellant, it therefore has the capacity to sue or be sued.

The Court notes that the district court's prior order dismissing Plaintiff's Original Petition also dismissed HPD on the grounds that HPD lacked the legal existence and capacity to be sued under Rule 17(b). After the Fifth Circuit's reversal, however, Plaintiff filed a Second Amended Complaint renaming HPD as a party. The parties now debate the legal effect of district court's prior order and whether it bars Plaintiff from renaming HPD as a party. The City argue that because Plaintiff did not challenge the district court's dismissal of HPD in her appeal to the Fifth Circuit, the decision is now final, and Plaintiff's attempts to rename HPD as a party are barred. Plaintiff asserts, however, that the City's argument misconstrues the district court's prior order; she contends that the order expressly granted the City's prior motion to dismiss on *res judicata* grounds only and that the City's other grounds for dismissal were not addressed. While the Court recognizes the potential *res judicata* concerns, neither party has adequately briefed this issue. In any event, the Court finds that the law and legal reasoning articulated in the district court's prior order of dismissal remains applicable to Plaintiff's Second Amended Complaint.

Under Federal Rule of Civil Procedure 17(b), in order to be sued, a "part[y] must have the capacity to sue or be sued." *Maxwell v. Henry*, 815 F. Supp. 213, 215 (S.D. Tex. 1993); *see also* FED. R. CIV. P. 17(b) (capacity to sue or be sued). Whether HPD has the capacity "to sue or be sued is 'determined by the law of the state in which the district court is held.'" *Paredes v. City of Odessa*, 128 F. Supp. 2d 1009, 1013 (W.D. Tex. 2000) (quoting *Darby v. Pasadena Police Dep't*, 939 F.2d 311, 313 (5th Cir. 1991) (citing FED. R. CIV. P. 17(b))). "In Texas, county sheriff's and police departments generally are not legal entities capable of being sued, absent express action by the superior corporation (the county, in the case of the sheriff's department) 'to grant the servient agency with jural authority.'" *Jacobs v. Port Neches Police Dep't*, 915 F. Supp. 842, 844 (E.D. Tex. 1996) (quoting *Darby*, 939 F.2d at 313). Thus, "[i]n order for a plaintiff to sue a city department, [that department] must enjoy a separate legal existence." *Darby*, 939 F.2d at 313 (internal citations and quotations omitted).

Here, the City's Municipal Charter states that the City "shall have power by ordinance duly passed to establish and maintain the City Police Department, prescribe the duties of policemen and regulate their conduct." City of Houston Charter, Article II, § 16. This language indicates that HPD is merely an arm of the City because its creation and functions are dependent on the will of the City's governing body.

Plaintiff has presented no contrary facts to demonstrate that HPD enjoys a separate legal existence apart from the City or that the City has otherwise granted it with jural authority. Therefore, the Court determines that, under Rule 17(b), HPD lacks the legal existence and capacity to be sued. Accordingly, Plaintiff's claims against it must be dismissed.

## B.    *Plaintiff's Claims Against Chief McClelland*

Plaintiff has sued Chief McClelland, in his official capacity as the City's Chief of Police, alleging that he continues to implement, authorize, and approve the current policies, which she challenges, and that he has and continues to do so under color of state law. Plaintiff seeks a writ of mandamus directing Chief McClelland to comply with federal law, namely 8 U.S.C. § 1373 and § 1644, and to refrain from prohibiting or restricting Plaintiff from contacting ICE to obtain or provide information about the immigration status of persons she lawfully encounters in performing her duties and responsibilities as a law enforcement officer.[7] The City moves to dismiss Plaintiff's

---

[7] Section 1373 states:

> Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [ICE] information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

Section 1644 states:

> Notwithstanding any other provision of Federal, State, or local law, no State or local government entity may be prohibited, or

claims against Chief McClelland contending that a suit against the Chief of Police in his official capacity, is actually a suit against the City, which is already a named party to this suit. The City further moves to dispel Plaintiff's request for mandamus relief contending that this Court lacks the authority to issue such relief upon Chief McClelland. Plaintiff maintains, however, that although she seeks relief against the City, her claims against Chief McClelland are not redundant because she is seeking mandamus relief against Chief McClelland, which is an available remedy to compel a public official, rather than a municipality, to perform ministerial acts.

As with HPD, the district court's prior order of dismissal also dismissed then-named Chief Hurtt on the grounds that the Court lacked the authority to grant the mandamus relief Plaintiff sought, and that Plaintiff's claims against Chief Hurtt, in his official capacity, were in actuality, just another way of pleading against the City. After the Fifth Circuit's reversal, however, Plaintiff filed her Second Amended Complaint renaming Chief Hurtt's successor—Chief McClelland—and seeking the identical mandamus relief. Again the parties debate the legal effect of the district court's prior order, but neither party has adequately briefed the *res judicata* effects. In any event, as with the dismissal of HPD, the Court finds that the law and legal

---

in any way restricted, from sending to or receiving from [ICE] information regarding the immigration status, lawful or unlawful, of an alien in the United States.

reasoning articulated in district court's prior order of dismissal remains applicable to Plaintiff's Second Amended Complaint.

Under Title 28, United States Code § 1361, this Court has "original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361. Chief McClelland is not an officer or employee of the United States, or any agency thereof; thus, he is not subject to the mandamus authority granted to this Court. *See id.* Moreover, federal courts lack the general power "to direct [or compel] state officials in the performance of their duties and functions." *Noble v. Cain*, No. 04-30099, 2005 WL 361818, at *1 (5th Cir. Feb. 16, 2005) (citing 28 U.S.C. § 1361 and *Moye v. Clerk, DeKalb Cnty. Superior Court*, 474 F.2d 1275, 1275–76 (5th Cir. 1973)). Therefore, because this Court lacks jurisdiction to issue the mandamus relief Plaintiff seeks, her claim for such relief against Chief McClelland must be dismissed.

Additionally, with respect to Plaintiff's official capacity claims against Chief McClelland, the Court finds that these claims should be dismissed as they are simply another way of pleading against the City, which is already a party to this action. *See Hafer v. Melo*, 502 U.S. 21, 25 (1991) ("[O]fficial-capacity suits 'generally represent only another way of pleading an action against an entity of which an officer is an

agent.'" (quoting *Kentucky v. Graham*, 473 U.S. 159, 165 (1985))); *see also City of Hempstead v. Kmiec*, 902 S.W.2d 118, 122 (Tex. App.—Houston [1st Dist.] 1995, no writ) (citing *Winograd v. Clear Lake City Water Auth.*, 811 S.W.2d 147, 162 (Tex. App.—Houston [1st Dist.] 1991, writ denied) (reasoning that "[s]uits against a governmental official in his official capacity are just another way of pleading a suit against a governmental entity of which the official is an agent").

C.   ***Plaintiff's Claims Against the City Under § 1983 for Alleged Violations of Her Right to Freedom of Expression Under the First Amendment of the United States Constitution***

Title 28, United States Code, § 1983 provides injured plaintiffs with a cause of action when they have been deprived of federal rights under color of state law. *Doe v. Dallas Indep. Sch. Dist.*, 153 F.3d 211, 215 (5th Cir. 1998). To state a claim under § 1983, a plaintiff must (1) allege a violation of rights secured by the constitution or laws of the United States; and (2) demonstrate that the alleged deprivation was committed by a person or entity acting under color of state law. *Id.* at 215. A municipality may be sued under § 1983 "'if it is alleged to have caused a constitutional tort through a policy statement, ordinance, regulations, or decision officially adopted and promulgated by that body's officers." *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 166 (5th Cir. 2010) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 121 (1988)). In order to establish municipal liability, a

plaintiff must demonstrate three elements: (1) a policymaker; (2) an official policy, and (3) a violation of a constitutional right whose moving force is the policy or custom. *Id.* (quotations omitted).

Plaintiff's Second Amended Complaint alleges that the City has, under color of state law, adopted,  promulgated, and approved the continuation of the subject policies that substantially restrict her from contacting ICE, without threat of termination or subsequent discipline, to obtain or provide information about the immigration status of persons she lawfully encounters in performing her duties and responsibilities as a law enforcement officer.  As a result, Plaintiff alleges that the City's policies infringe upon her right to freedom of expression under the First Amendment to the United States Constitution.[8]  Neither party disputes the existence of a policy maker or an official policy. Rather, the parties' dispute focuses on whether Plaintiff's allegations give raise to a First Amendment violation for purposes of stating a claim under § 1983.

---

[8] The Court construes Plaintiff's claim to mean that as a result of the City's policies, she has been forced to censor her communications with ICE for fear of termination or subsequent discipline.  The Court notes that self-censorship constitutes a First Amendment harm that may be realized even with out actual termination or discipline. *See, e.g., Ctr. Individual Freedom v. Carmouche*, 449 F.3d 655, 660–61 (5th Cir. 2006) (recognizing that engaging in self-censorship is sufficient to confer First Amendment standing so long as the self-censorship arises from a fear of punishment that is not imaginary or wholly speculative).

### 1.  *Legal framework on public-employee speech*

Because Plaintiff is a public employee, her allegations must be analyzed under the legal framework on public-employee speech.  "Public employees do not surrender all their free speech rights by reason of their employment.  Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen on matters of public concern." *Williams v. Dallas Indep. Sch. Dist*, 480 F.3d 689, 693 (5th Cir. 2007) (per curium) (citing *Pickering v. Board of Educ.*, 391 U.S. 563, 568 (1968)); *see also Davis v. McKinney*, 518 F.3d 304, 311 (5th Cir. 2008) (stating and citing same). "A public employee's speech is protected by the First Amendment when the interests of the worker 'as a citizen commenting upon matters of public concern' outweigh the interests of the state 'as an employer, in promoting the efficiency of the services it performs through its employees.'" *Williams*, 480 F.3d at 692 (quoting *Pickering*, 391 U.S. at 568).

The United States Supreme Court has emphasized the distinction between a speaker acting in her role as a "citizen" and her role as an "employee" and held that "when public employees make statements *pursuant to* their *official duties*, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006) (emphasis added).  Interpreting the Supreme Court's "pursuant to"

18

language, the Fifth Circuit has stated that "[a]ctivities undertaken in the course of performing one's job are activities pursuant to official duties." *Williams v. Dallas Indep. Sch. Dist*, 480 F.3d 689, 693 (5th Cir. 2007). The Fifth Circuit has further stated that "[e]ven if the speech is of great social importance, it is not protected by the First Amendment so long as it was made pursuant to the worker's official duties." *Id.* Since *Garcetti*, the Fifth Circuit "has repeatedly held that statements made in the course of performing one's job are not protected." *Elizondo v. Parks*, 431 F. App'x 299, 303–04 (5th Cir. 2011).

Under *Garcetti*, then, "before asking whether the subject-matter of particular speech is a topic of public concern, [courts] must decide whether the plaintiff was speaking 'as a citizen' or as part of her public job." *Davis*, 518 F.3d at 312 (quoting *Mills v. City of Evansville*, 452 F.3d 646, 647–48 (7th Cir. 2006)). For this initial inquiry, a court's focus is not on the speech's content, but rather "the role the speaker occupied when [s]he said it." *Id.* Additionally, to determine whether speech was made pursuant to an individual's official duties, courts review a number of factors, including the internal versus external nature of the speech, the employee's formal job description, whether the employee spoke on the subject matter of his or her employment, and whether the speech resulted from special knowledge gained as an employee. *Williams*, 480 F.3d

at 692; *Davis*, 518 F.3d at 313; *Charles v. Grief*, 522 F.3d 508, 513 (5th Cir. 2008). No

one factor alone is dispositive.

If an individual's speech is determined to have been spoken "as a citizen," then

the next inquiry is whether the individual's speech is on a matter of public concern.

"Matters of public concern are those which can 'be fairly considered as relating to any

matter of political, social, or other concern to the community.'" *Branton v. City of*

*Dallas*, 272 F.3d 730, 739 (5th Cir. 2001) (quoting *Connick v. Myers*, 461 U.S. 138, 146

(1983)). If an individual's speech is determined to have been spoken as a "citizen" on

a "matter of public concern," then the final task is to "determine[] whether the interest

of the government employer 'in promoting the efficiency of the public services it

performs through its employees' outweighs the employee's interests, as a citizen, 'in

commenting upon matters of public concern.'" *Nixon v. City of Houston*, 511 F.3d 494,

498 (5th Cir. 2007) (quoting *Pickering*, 391 U.S. 563, 568).

### 2.   *Application*

With this framework in mind, the Court turns to Plaintiff's Second Amended

Complaint to determine whether her pleaded allegations give rise to a First Amendment

violation for purposes of stating a § 1983 claim. Plaintiff's Second Amended Complaint

alleges in relevant part as follows:

- The City's policies "substantially restrict her from communicating with ICE about matters concerning the status of undocumented aliens and those who are criminally present as undocumented aliens in the United States."[9]

- "Plaintiff does not seek to detain or arrest persons in order to inquire about their immigration status. Rather, Plaintiff seeks to use her **professional judgment** to determine when it is appropriate to contact ICE to inquire or provide information about a person's immigration status if, **in the course of carrying out her duties and responsibilities as a law enforcement officer**, she has reason to believe a crime may have been committed." The Houston Police Department's current policies, practices, customs, and procedures largely prohibit such communications and **harm Plaintiff's ability to carry out her duties and responsibilities as a law enforcement officer.**[10]

- "At the time Plaintiff was sworn in as a Houston Police Officer, she took the following **oath**: I do solemnly swear that I will faithfully execute the **duties of the office** of Regular Officer of the City of Houston, Texas, and will to the best of my ability preserve, protect, and defend the Constitution and laws of the United States and of this State and City. So help me God."[11]

- "As an officer in the Houston Police Department, Plaintiff is charged by City Ordinance 34-21 with the **duty** of "detecting and preventing crimes, and arresting violators of the law."[12]

---

[9] Plaintiff's Second Amended Complaint at ¶ 1.

[10] *Id.* at ¶ 2 (emphasis added).

[11] *Id.* at ¶ 13 (emphasis added).

[12] *Id.* at ¶ 14 (emphasis added).

- "Current Houston Police Department policies, practices, customs, and procedures prohibit **officers** from contacting ICE to obtain information about a person's immigration status."[13]

- "[T]he practice, policy, custom, and procedure as set out on General Order 500-05 strictly prohibit [Plaintiff], without being terminated or discipline, and suffering irreparable harm by contacting ICE to determine one's immigration status **during a legal detention** in direct contravention to General Order 500-5 [*sic*] and other policies, practices, customs, and procedures."[14]

- "ICE operates and maintains a broad range of databases regarding persons' citizenship and immigration status, and it makes this information available to other **law enforcement agencies** whose policies, practices, and procedures allow them to access it.  In this regard, in 1994, the Law Enforcement Support Center ("LESC") was established . . . to provide timely, accurate information **to local, state, and federal law enforcement agencies** on individuals arrested, suspected, or under investigation for criminal activity. . . . According to an ICE Fact Sheet, '[t]he primary users of the LESC are **state and local law enforcement officers in the field** who need information about foreign nationals they encounter **in the course of their daily duties.**'"[15]

- "By limiting an **officer** to checking the 'wanted' status, via the NCIC database, of a person who is **lawfully detained, ticketed, arrested, or jailed**, the Houston Police Department substantially restricts the **officer's** ability to obtain information from ICE."[16]

- "Even when a person's immigration status is or becomes known to an **officer**, such as if a person identifies himself or herself as an undocumented

---

[13] *Id.* at ¶ 23 (emphasis added).

[14] *Id.* at ¶ 25 (emphasis added).

[15] *Id.* at ¶ 30 (emphasis added).

[16] *Id.* at ¶ 31 (emphasis added).

alien or a preciously deported alien, current Houston Police Department policies, practices, and procedures substantially restrict the **officer's** ability to report that information to ICE or to contact ICE '**while on the street**' unless that person is arrested."[17]

- "Thus, the HPD policies, practices, and procedures mandated to its **officers** prohibits them from communicating with or notifying ICE **while on the street** even if such persons identify themselves as undocumented or previously deported aliens."[18]

- "Plaintiff seeks to have the ability to contact LESC or other appropriate ICE offices to request or provide information about the immigration status of persons the **Plaintiff or other officers lawfully encounters** who are violating federal immigration law while the **Plaintiff or other HPD officers in the course of carrying out daily duties and responsibilities** which she and other officers are strictly prohibited from doing, pursuant to current Houston Police Department's current policies, practices, customs, and procedures."[19]

- "The Houston Police Department's policies, practices, and procedures restricting Plaintiff's ability to obtain or provide information to ICE about the immigration status of person **she lawfully encounters in carrying out her duties and responsibilities as a law enforcement officer** have injured Plaintiff by harming **her ability to fulfill her oath and otherwise carry out her duties and responsibilities as a law enforcement officer.**"[20]

- The City's "policies, practices, and procedures . . . substantially restrict, if not prohibit, Plaintiff and other HPD Officers from contacting ICE to obtain or provide information about the immigration status of persons she **lawfully**

---

[17] *Id.* at ¶ 32 (emphasis added).

[18] *Id.* at ¶ 34 (emphasis added).

[19] *Id.* at ¶ 35 (emphasis added).

[20] *Id.* at ¶ 36 (emphasis added).

**encounters in performing her duties and responsibilities as a law enforcement officer."**[21]

The City contends Plaintiff's allegations demonstrate that her desired communications with ICE would be made pursuant to her official job duties as a law enforcement officer, and therefore, are not protected under the First Amendment. The Court agrees. Under the precedents articulated in *Garcetti v. Ceballos*, 547 U.S. 410 (2006), *Williams v. Dallas Indep. Sch. Dist.*, 480 F.3d 689 (5th Cir. 2008), and *Nixon v. City of Houston*, 511 F.3d 494 (5th Cir. 2007), Plaintiff's allegations do not state a First Amendment violation.

In *Garcettii*, a deputy district attorney for the Los Angeles County District Attorney's office drafted a memorandum to his supervisors highlighting his concerns over inaccuracies in an affidavit used to procure a warrant and suggesting the office refrain from prosecuting the case for which the warrant was obtained. The deputy brought a First Amendment retaliation claim contending that in response to his memoranda, was subjected to a series of retaliatory events. The Supreme Court found that the deputy's statements in the memoranda were not protected speech because they were made "pursuant to his duties as a calendar deputy," specifically, the fulfillment of his "responsibility to advise his supervisor about how best to proceed with a pending

---

[21] *Id.* at ¶ 44 (emphasis added).

case." *Garcetti*, 547 U.S. at 421. The Court reasoned that "'[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Id.* at 421–22.

In *Williams*, the Fifth Circuit analyzed *Garcetti* and determined that its holding, at minimum, demonstrates that "[j]ob required speech is not protected." *Williams*, 480 F.3d at 693. The Fifth Circuit went on, however, to "determine the extent to which, under *Garcetti*, a public employee is protected by the First Amendment if his speech is not necessarily required by his job duties but nevertheless related to his job duties." *Id.* In *Williams*, a highly school athletic director was removed from his position after he wrote several memoranda to high-ranking school officials, including the principal, calling into question the school's handling of its athletic fund. Although the memoranda were not required as part of Williams's job duties, the Fifth Circuit nevertheless found that Williams wrote the memoranda in the course of performing his job because he needed accounting information from the school principal and office manager so that Williams could perform his duties as Athletic Director. *Id.* at 694.

Finally, in *Nixon*, the Fifth Circuit held that an HPD Patrol Officer's statements to the media concerning a high speed car chase, which resulted in an accident, were not

protected "because they were made pursuant to his official duties and during the course of performing his job." *Nixon*, 511 F.3d at 498. Relying on *Garcetti* and *Williams*, the Fifth Circuit reasoned that the Officer's statements were not protected because they were made to the media while on duty, in uniform, and while working at the scene of the accident. *Id.* at 499.

In the present case, Plaintiff's allegations are replete with references to her professional judgment, her duties and responsibilities as a law enforcement officer, her oath to faithfully execute such duties and responsibilities, and her ability to contact ICE in her capacity as a law enforcement officer while "out on the street," during the course of carrying out her daily duties, and during legal detentions of those she lawfully encounters. Thus, by Plaintiff's own pleadings, it is clear that her desired communications with ICE would necessarily owe their existence to her professional responsibilities as a law enforcement officer and that they would be made in the course of performing her official duties as a law enforcement officer. *See Garcetti*, 547 U.S. at 421–22; *Williams*, 480 F.3d at 694; *Nixon*, 511 F.3d at 499.

Plaintiff asserts her case is distinguishable from those cited above; but her arguments are unpersuasive. First, Plaintiff contends that her case is unlike *Garcetti* because the communications she seeks to engage in with ICE, although related to her job, are not "required" by her job. This contention is foreclosed by *Williams* where the Fifth

26

Circuit determined that even though a public employee's speech is not required as part of her job, it nevertheless remains unprotected if the speech is made in the course of performing that job. *Williams*, 480 F.3d at 693; *see also Nixon*, 511 F.3d at 498–99 (relying on *Williams* and stating: "The fact that Nixon's statement was unauthorized by HPD and that speaking to the press was not part of his regular job duties is not dispositive—Nixon's statement was made while he was performing his job, and the fact that Nixon performed his job incorrectly, in an unauthorized manner, or in contravention of the wishes of his supervisor does not convert his statement at the accident scene into protected citizen speech."). Moreover, the Court notes that the policies Plaintiff challenges actually contain provisions that instruct her to contact ICE if she arrests a person and knows that person is an illegal alien, or if she runs the "wanted" status of a detained person and she receives an NCIC Immigration Hit.[22] As with *Nixon*, the fact

---

[22] *See* General Order 500-05 ("Officers **will** contact the [ICE] regarding a person *only if* that person is arrested on a separate criminal charge (other than a class C misdemeanor) and the officer knows the prisoner is an illegal alien.") (emphasis added); Circular No. 06-1010-298 ("Officers who receive an NCIC Immigration Hit (Criminal Enforcement of Administrative Warrant of Removal and/or ICE Detainer on Previously Deported Felons) **will** confirm the information as instructed within the NCIC Hit. Persons with confirmed hits from [ICE] **will** be handled as a fugitive hold. . . . Officers **will** have **direct contact** with the Law Enforcement Support Center (LESC) at a 1-800 number dedicated exclusively to law enforcement and advise them of the NCIC information hit. Once the identity of the person and the warrant or detainer are confirmed, ICE **will** be contacted for acceptance of a criminal hold on the suspect by our Dispatch and/or Jail Division. . . . Undocumented aliens are prohibited from possessing firearms and can be charged federally with a felony pursuant to Title 18, United States Code, section 922(g)(5). The Harris County District Attorney's Office has agreed to refer these cases to the U.S. Attorney's Office for prosecution. Anyone

that Plaintiff desires to communication with ICE outside the scope of these policies, while on duty, and in her capacity as an HPD Officer, does not convert her communications into protected citizen speech.

Plaintiff next contends that her case is distinguishable from both *Garcetti* and *Williams* because the communications she seeks to engage in with ICE are not *internal* office communications; rather, they are *external* communications, which she contends are more analogous to statements the Fifth Circuit approved for First Amendment protection in *Davis v. McKinney*, 518 F.3d 304 (5th Cir. 2008) and *Charles v. Grief*, 522 F.3d 508 (5th Cir. 2008). In *Davis*, an Information Systems Audit Manager at the University of Texas Health Science Center uncovered the existence of child pornography on various employee work computers. The Audit Manager reported her findings, but her management was unresponsive. She then complained up the chain of command that her management had a pattern of sweeping pornography audits under the rug and not terminating or disciplining offending employees. Even further, she contacted the FBI concerning her audit findings on the existence of child pornography, and the EEOC concerning her complaints about various discriminatory employment practices. After being terminated, the Audit Manager brought suit alleging she was retaliated against for

---

encountering an undocumented alien in possession of a firearm **should** place them on hold for the Major Offenders Division so that they can be prosecuted federally . . . .") (emphasis added).

28

exercising her free speech rights. The Fifth Circuit determined the Audit Manager's complaints up the chain of command did not qualify for First Amendment protection because they were job-related complaints made in the course of performing her job. *Davis*, 518 F.3d at 313, 317 (reasoning that "when a public employee raises complaints or concerns up the chain of command at [her] workplace about [her] job duties, that speech is undertaken in the course of performing [her] job."). The Fifth Circuit also determined, however, that the Audit Manager's complaints to the FBI and EEOC were not made as an employee, but as a citizen, because communications to outside police authorities or other agencies during an investigation did not fall within the Audit Manager's job function. *Davis*, 518 F.3d at 313, 317 (reasoning that "[i]f . . . a public employee takes [her] job concerns to persons outside the work place in addition to raising them up the chain of command at [her] workplace, then those external communications are ordinarily not made as an employee, but as a citizen.").

Similarly, in *Charles*, a Systems Analyst at the Texas Lottery Commission raised concerns in an e-mail to high-ranking Commission officials regarding racial discrimination and retaliation, misuse of funds, and other alleged misconduct by the Commission. When the Systems Analyst did not receive a response, he forwarded the e-mail to members of the Texas Legislature with oversight authority over the Commission. Two days later, the Systems Analyst was terminated, after which he

brought a claim alleging First Amendment retaliation. In determining that the Systems Analyst's e-mail qualified for First Amendment protection, the Fifth Circuit stated that his "speech—unlike that of the plaintiffs in *Garcetti* and *Williams*—was not made in the course of performing or fulfilling his job responsibilities, was not even indirectly related to his job, and was not made to higher ups in his organization . . . but was communicated directly to elected representatives of the people." *Charles*, 522 F.3d at 514. Additionally, the Fifth Circuit noted that "the persons to whom [the Systems Analyst] directed his e-mails further distinguishes his speech from that of the plaintiffs in *Garcetti* and *Williams*: [he] voiced his complaints *externally*, to Texas legislators who had oversight authority over the Commission, not *internally*, to supervisors." *Id.* (emphasis in original).

Plaintiff's reliance on *Davis* and *Charles* is unpersuasive. While those cases indeed cast a distinction between *internal-* and *external*-employee communications, they do not deviate from the key question in all public-employee cases within the Fifth Circuit since *Garcetti*—that is, *whether the statements were made in the course of performing one's job. See Elizondo*, 431 F. App'x at 303–04 (stating that since *Garcetti*, the Fifth Circuit "has repeatedly held that statements made in the course of performing one's job are not protected."). Squaring that question with the face of Plaintiff's pleaded allegations, the Court is not persuaded that *Davis* and *Charles* convert her desired communications with ICE into protected citizen speech. Unlike the Audit Manager's

communications to the FBI and EEOC in *Davis*, which the Fifth Circuit found were not part of the Audit Manager's job function, Plaintiff's pleaded allegations highlight that her desired communications would be carried out in the performance of her job as a law enforcement officer. Additionally, as previously noted, the policies Plaintiff challenges actually instruct her to communicate with ICE in various circumstances, which the Court finds sufficient to bring her desired speech within the realm of her professional responsibilities as an HPD Officer. Finally, unlike the Systems Analyst's communications to the Texas Legislator in *Charles*, which the Fifth Circuit found were not made in the course of performing or fulfilling his job responsibilities and were not even indirectly related to his job, Plaintiff pleaded allegations emphasize that her desired speech is necessarily related to her professional responsibilities as an HPD Officer.

In Plaintiff's final distinguishing point, she argues that *Nixon* is inapposite to the present case, contending that *Nixon* was a case about insubordination, not free speech. Plaintiff's contention is misplaced. *Nixon* unquestionable dealt with public-employee speech, and in resolving that case, the Fifth Circuit specifically relied on *Garcetti* and *Williams*, both of which dealt with public-employee speech. Indeed the Fifth Circuit described Nixon's conduct as insubordination; but, it did so in the context of weighing Nixon's interests as a citizen to comment on matters of a public concern against the government's interest as an employer to operate its government service, not in

determining whether his speech was citizen or employee speech. *Nixon*, 511 F.3d at 499. Not only did the Fifth Circuit find that Nixon's interests were outweighed, it determined just prior to that finding that Nixon's "media statement at the scene of the accident is not protected by the First Amendment because it was made pursuant to his official duties and during the course of performing his job." *Id.* at 498.

Taking Plaintiff's pleaded allegations as true, which the Court must for purposes of a 12(b)(6) motion to dismiss, the Court finds that on the face of Plaintiff's Second Amended Complaint, her allegations demonstrate that her desired communications with ICE would be undertaken in the course of performing her official job duties as a law enforcement officer. Consequently, her allegations do not give rise to a First Amendment violation, and therefore, fail to state a claim under § 1983. Accordingly, this claim is dismissed.

### D.   *Plaintiff's Claims Against the City Under § 1983 for Alleged Violations of Her Right to Inform Federal Officials of Federal Law Violations*

In addition to the First Amendment, Plaintiff alleges that the City's policies infringe upon her inherent constitutional right as a U.S. citizen to inform federal officials about violations of federal law.[23] The City moves to dismiss this claim contending

---

[23] As with Plaintiff's First Amendment claim, the Court construes Plaintiffs's pleadings to mean that as a result of the City's policies, Plaintiff has been forced to censor her communications with ICE concerning federal crimes for fear of termination or subsequent discipline. Additionally, according to Plaintiff's response to the City's motion to dismiss, her asserted constitutional right to report violations of federal law falls within

generally that it fails to state a claim upon which relief may be granted.  The Court agrees.

As an initial matter, the Court notes that the policies at issue do not restrict Plaintiff from reporting to federal authorities information concerning violations of federal laws.  In fact, the policies specifically instruct officers to contact ICE when an individual has been arrested and the arresting officer knows the individual is an illegal

---

those rights, privileges, and immunities guaranteed by the U.S. Constitution. In support thereof, Plaintiff cites *In re Qualres*, 158 U.S. 532 (1898), wherein the Supreme Court stated:

> It is the duty and the right, not only of every peace officer of the United States, but of every citizen to assist in prosecuting and in securing the punishment of, any breach of the peace of the United States.  It is the right, as well as the duty, of every citizen, when called upon by the proper officer, to act as part of the posse comitatus in upholding the laws of his country.  It is likewise his right and his duty to communicate to the executive officers any information which he has of the commission of an offense against those laws; and such information, given by a private citizen, is a privilege and confidential communication, for which no action of libel or slander will lie, and the disclosure of which cannot be compelled without thee assent of the government.  The right of a citizen informing of a violation of law . . . does not depend upon any of the amendments to the constitution, but arises out of the creation and establishment by the constitution itself of a national government, paramount and supreme within its sphere of action.

*In re Qualres*, 158 U.S. at 960–61. Plaintiff also cites *Williams v. Allen*, 439 F.2d 1398 (5th Cir. 1971), wherein the Fifth Circuit relied on *Qualres* and determined that a police officer had properly stated a claim under § 1983 by alleging he was terminated in retaliation for reporting supposed violations of federal law to the IRS—specifically, that the Chief of Police and a Captain were receiving payoffs from individuals involved in lottery rackets. *Williams*, 439 F.2d at 1399–1400.

alien.[24]   The policies further advise officers encountering undocumented aliens in

possession of a firearm to place those individuals on hold for federal prosecution.[25]

Additionally, Plaintiff does not allege that she was, or is, actually aware of, or is in

possession of, any information concerning violations of federal immigration laws or

other federal criminal laws.   To the contrary, Plaintiff alleges that she "does not seek to

detain or arrest persons in order to inquire about their immigration status.   Rather, [she]

seeks to use her professional judgment to determine when it is appropriate to contact ICE

_____

[24] *See generally* General Order 500-05 ("Houston police officers may not stop or apprehend individuals solely on the belief that they are in this country illegally. . . . Officers shall not make inquires as to the citizenship status of any person, nor will officers detain or arrest persons solely on the belief that they are in this country illegally. . . .   Officers will contact [ICE] regarding a person only if that person is arrested on a separate criminal charge (other than a class C misdemeanor) and the officer knows the prisoner is an illegal alien); *see also generally* Circular No. 06-1010-298 ("Officers will NOT detain or arrest persons solely on the suspicion that they are in this country illegally. . . .   Officers have the discretion to check the wanted status of any one legally detained. . . .   Officers SHALL check the wanted status of everyone that is ticketed, arrested, and/or jailed. . . .   Officers who receive an NCIC Immigration Hit (Criminal Enforcement of Administrative Warrant of Removal and/or ICE Detainer on Previously Deported Felons) will confirm the information as instructed within the NCIC Hit.   Persons with confirmed hits from [ICE] will be handled as a fugitive hold. . . .   Officers will have direct contact with the [LESC] at a 1-800 number dedicated exclusively to law enforcement and advise them of the NCIC information hit.   Once the identity of the person and the warrant or detainer are confirmed, ICE will be contacted for acceptance of a criminal hold on the suspect by our Dispatch and/or Jail Division. . . .   Undocumented aliens are prohibited from possessing firearms and can be charged federally with a felony pursuant to Title 18, United States Code, section 922(g)(5). The Harris County District Attorney's Office has agreed to refer these cases to the U.S. Attorney's Office for prosecution. Anyone encountering an undocumented alien in possession of a firearm should place them on hold for the Major Offenders Division so that they can be prosecuted federally . . . .").

[25] *Id.*

to inquire or provide information about a person's immigration status if, in the course of carrying out her duties and responsibilities as a law enforcement officer, she has reason to believe a crime may have been committed."[26]  While the City's polices restrict her from using her position as a law enforcement officer from questioning, interrogating, detaining or arresting individuals solely on the suspicion that they are in the United States illegally or from contacting ICE to obtain immigration status information on individuals she suspects may be in the country illegally, without first making an arrest or determining whether the individual is the subject of an ICE-issued warrant, such a restriction does not infringe any inherent constitutional rights to report violations of federal laws.  Plaintiff's inherent right as a U.S. citizen to report federal law violations does not extend to an inherent right for Plaintiff to use her capacity and professional judgment as a law enforcement officer to conduct investigations and ferret out whether individuals she encounters are illegal aliens.  Therefore, to the extent Plaintiff alleges the City's policies infringe upon her inherent right to report violations of federal law, her pleadings fail to state a claim because the polices do not restrict such reporting. Additionally, to the extent Plaintiff alleges the City's policies prohibit her from contacting ICE to inquire or obtain information concerning the immigration status of individuals she suspects are unlawfully present in the United States, her pleadings fail

---

[26] Plaintiff's Second Amended Complaint at ¶ 2.

to state a claim because she maintains no inherent constitutional right as a law enforcement officer to conduct such investigations.

**E.    Plaintiff's Claims Against the City Under § 1983 for Alleged Violation of Her Rights Under 8 U.S.C. § 1373 and § 1644**

Plaintiff alleges that the City's policies restrict or prohibit her from contacting ICE regarding the immigration status of individuals she encounters as a police officer unless those individuals have first been arrested and Plaintiff knows the individual is an illegal alien. Plaintiff contends that these policies violate her individual right to contact ICE to obtain or provide information about a person's immigration status as set forth in 8 U.S.C. § 1373(a) and 8 U.S.C. § 1644.  The City moves to dismiss this claim contending that neither statute confers upon Plaintiff any individual right enforceable under § 1983.

"Section 1983 permits private individuals to sue state actors to enforce constitutional rights as well as rights created by federal statutes." *Anderson v. Jackson*, 556 F.3d 351, 356 (5th Cir. 2009) (citing *Johnson v. Housing Auth. of Jefferson Parish*, 442 F.3d 356, 359 (5th Cir. 2006)).  "But § 1983 only provides redress for a plaintiff who asserts a 'a violation of a federal *right*, not merely a violation of federal *law*.'" *Walgreens Co. v. Hood*, 275 F.3d 475, 477 (5th Cir. 2001) (quoting *Blessing v. Freestone*, 520 U.S. 329, 340 (1997) (emphasis in original)).  "Whether such [a] right [has] been conferred depends on [c]ongressional intent, as indicated by the text and structure of the statute." *Anderson*, 556 F.3d at 356.

36

To determine congressional intent, a court's analysis is guided by a three-factor test articulated by the Supreme Court: "(1) Congress must have intended that the provisions in question benefit the private plaintiff; (2) the right assertedly protected by the statute must not be so 'vague and amorphous' that its enforcement would strain judicial competence; and (3) the statute must unambiguously impose a binding obligation on the states, with the asserted right couched in mandatory rather than precatory terms." *Johnson*, 442 F.3d at 360 (citing *Blessing*, 520 U.S. at 340–41). Importantly, a federal statute fails to confer enforceable rights when it (i) "entirely lack[s] the sort of 'rights-creating' language critical to showing the requisite [c]ongressional intent to create new rights;" (ii) "speak[s] only in terms of institutional policy and practice, not individual" concerns; and (iii) has "an 'aggregate' focus [and is] not concerned with 'whether the needs of any particular person have been satisfied.'" *Gonzaga Univ. v. Doe*, 536 U.S. 273, 287–88 (2002). Once it has been determined that a federal statute confers an individual right, then the right is presumptively enforceable under § 1983. *Id.* at 284. The State may rebut this presumption, however, by showing that Congress specifically foreclosed private enforcement under § 1983 either expressly "through specific evidence in the statute itself," or "impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." *Id.* at 284 n.4 (internal citations omitted).

Applying these principles to the two statutes in question, the Court finds that Congress did not clearly and unambiguously intend to benefit Plaintiff individually. To begin with, § 1644 states:

> Notwithstanding any other provision of Federal, State, or local law, **no State or local government entity may be prohibited, or in any way restricted**, from sending to or receiving from [ICE] information regarding the immigration status, lawful or unlawful, of an alien in the United States.[27]

This statute does not contain the sort of "'rights-creating' language critical to showing the requisite congressional intent to create new rights." *Gonzaga*, 536 U.S. at 287. Unlike the "individually focused terminology" contained in Title VI of the Civil Rights Act and Title XI of the Education Amendments (*i.e.*, "*No person* . . . shall . . . be subjected to discrimination"), which the Supreme Court has found sufficient to confer an individual right, *see id.*, § 1644 speaks expressly in terms of preventing prohibitions or restrictions on the communications between ICE and any State or local government entity.[28] It does not contain any special language focusing on the need or concern of any

---

[27] 8 U.S.C. § 1644 (communication between State and local government agencies and Immigration and Naturalization Service). Section 1644 derives from Section 434 of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, which is now codified as part of the broader federal statutory framework on Immigration and Nationality.

[28] Title VI states: "*No person* in the United States *shall* . . . be subjected to discrimination under any program or activity receiving Federal financial assistance" on the basis of race, color, or national origin. 42 U.S.C. § 2000d (emphasis added). Title IX states: "*No person* in the United States *shall*, on the basis of sex, . . . be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C.

particular individual. *See also e.g.*, *Dickson v. Hood*, 391 F.3d 581, 602–03 (5th Cir. 2004) (noting the use of sufficient "rights-creating" language in Title VI and Title IX and concluding that § 1369(a) of the Medicaid Act also provided sufficient "rights-creating" language when it used the phrase "*all individuals*").[29]   Therefore,  § 1644 "does not confer the sort of '*individual* entitlement' that is enforceable under § 1983." *Gonzaga*, 536 U.S. at 287 (quoting *Blessing*, 520 U.S. at 343 (emphasis in original).

By comparison, § 1373(a) states:

> Notwithstanding any other provision of Federal, State, or local law, **a Federal, State, or local government entity or official** may not prohibit, or in any way restrict, **any government entity or official** from sending to, or receiving from, [ICE] information regarding the citizenship or immigration status, lawful or unlawful, of any individual.[30]

This statute speaks expressly in terms of preventing prohibitions or restrictions on the communications between ICE and any government entity *or official*.  While Plaintiff may arguably qualify as an "official," this provision does not clearly and unambiguously

---

§ 1681(a) (emphasis added).

[29] The Medicaid Act states that "[a] State Plan must provide for making medical assistance available, including at least the care and services listed in paragraphs (1) through (5), (17) and (21) of section 1396(a) of this title, to *all individuals*" who meet certain eligibility criteria. 42 U.S.C. § 1396(a)(10)(A)(i) (emphasis added).

[30] 8 U.S.C. § 1373(a) (emphasis added) (communication between Government agencies and the immigration and Naturalization Service). Section 1373 derives from Section 642 of the Immigration Reform Act of 1996, which is also now codified as part of the federal statutory framework on Immigration and Nationality.

demonstrate that Congress intended to address the individual concerns of officials in sharing information with ICE. Rather, § 1373 fits within a broader legal framework addressing the governance of aliens and nationality, and it operates with an aggregate focus on ensuring federal immigration agencies receive State and local government assistance in the enforcement of immigration matters as a whole.

It is well settled that the "[p]ower to regulate immigration is unquestionably exclusively a federal power." *De Canas v. Bica*, 424 U.S. 351, 354 (1976); *see also Arizona v. United States*, 132 S. Ct. 2492, 2498 (2012) ("The Government of the United Stats has broad, undoubted power over the subject of immigration and the status of aliens. . . . This authority rests, in part, on the National Government's constitutional power to 'establish a uniform Rule of Naturalization,' and its inherent power as sovereign to control and conduct relations with foreign nations." (quoting U.S. CONST., art. I, § 8, cl. 4) (internal cations omitted)).  In establishing a uniform rule of naturalization, Congress enacted the Immigration and Nationality Act ("INA"), which "established a 'comprehensive federal statutory scheme for regulation of immigration and naturalization' and set 'the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country.'" *Chamber of Commerce v. Whiting*, 131 S. Ct. 1968, 1973 (2011) (quoting *De Canas*, 424 U.S. at 359).  Since its

enactment, Federal governance under the INA has become increasingly extensive and complex. *See Arizona*, 132 S. Ct. at 2499, 2504.

While State governments do not have authority to directly regulate aliens and immigration, *see id.* at 2500–01; *De Canas*, 424 U.S. at 358, various provisions within the INA demonstrate that Congress has no doubt recognized that State and local government cooperation with federal enforcement officials in is key to the immigration system. *See, e.g.*, 8 U.S.C. § 1324(c) (providing that arrests for violation of the INA's criminal provisions against smuggling, transporting, or harboring aliens may be made, not only by federal immigration offices, but also by "all other offices whose duty it is to enforce criminal laws"); 8 U.S.C. § 1252c (authorizing state and local law enforcement officials to arrest aliens who are unlawfully present in the United States and were previously deported after being convicted of a felony); 8 U.S.C. § 1103(a)(10) (granting power to the Attorney General to authorize state and local law enforcement officers to perform federal immigration officer functions when an "actual or imminent mass influx of aliens . . . presents urgent circumstances requiring an immediate Federal response"); 8 U.S.C. § 1357(g) (authorizing State officers and employees to cooperate in the performance of federal immigration officer functions under voluntary agreements with the U.S. Attorney General).[31]

---

[31] Under § 1357(g), the U.S. Attorney General may enter into a voluntary written agreement with a State or any political subdivision, whereby the Attorney General authorizes

Congress has further recognized that effective cooperation necessarily entails consultation between federal and state officials concerning the immigration status of individuals they encounter. *See, e.g.*, 8 U.S.C. § 1357(g)(10) (recognizing that no formal agreement need be in place for state officers to "communicate with the [Federal Government] regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States"); 8 U.S.C. § 1373 (proscribing Federal, State, or local government entities or officials from prohibiting or restricting any other government entities or officials from communicating information with ICE regarding the citizenship or immigration status of any individual).

Therefore, construing § 1373(a) in the context of the broader federal immigration scheme, the Court is of the opinion that Congress did not enact § 1373 with the aim of addressing any particular individual needs or concerns regarding information sharing. Rather, Congress enacted this provision with the aim of fostering a nationwide system of voluntary information sharing with an aggregate focus on assisting federal law-

---

State or local officers to carry out functions of immigration officers related to the investigation, apprehension, or detention of aliens in the United States. *See* 8 U.S.C. § 1357(g)(1)–(9). Additionally, under § 1357(g)(10), Congress has made clear that no formal agreement need be in place for state officers to "communicate with the [Federal Government] regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States." *Id.* § 1357(g)(10).

enforcement officials in the enforcement of immigration matters. Accordingly, § 1373 does not confer any particular individual rights enforceable under § 1983.[32]

**F.    *Plaintiff's Claims for Alleged Violation of Her Right to Freedom of Expression Under Article I, Section 8 of the Texas Constitution***

Plaintiff alleges that the City's policies infringe upon her right to freedom of expression under Article I, section 8 of the Texas Constitution. Plaintiff's allegations here are precisely the same as those in her First Amendment claim under § 1983. Thus, the City's grounds for dismissal are likewise the same.

Both the Fifth Circuit and the Texas Supreme Court have recognized that Article I, section 8 of the Texas Constitution may be more expansive than that of the First Amendment. *See Carpenter v. Wichita Falls Indep. Sch. Dist.*, 44 F.3d 362, 368 (5th Cir. 1995); *Tex. Dep't of Transp. v. Barber*, 111 S.W.3d 86, 106 (Tex. 2003), *cert. denied*, 540 U.S. 1177 (2004). The Texas Supreme Court has further recognized that unless a party demonstrates through the "text, history, and purpose" of Article 1, section 8, that the Texas Constitution offers broader protections than the First Amendment with respect to a particular instances, then courts may assume that both constitutions offer the same free speech protections. *See Tex. Dep't of Transp.*, 111 S.W.3d at 106.

---

[32] The Court does not decide whether the City's polices at issue here would survive a preemption challenge under the Supremacy Clause of the United States Constitution. All that is decided is that neither § 1644 nor § 1373 confer upon Plaintiff any individual right that may be enforced under § 1983.

Plaintiff does not assert any reasons why the Texas Constitution should be read to offer any free speech protections that are broader than those under the First Amendment.  Therefore, because her allegation did not give rise to a First Amendment violation, they also do not give rise to a violation under Article 1, section 8 of the Texas Constitution.  *See id.*  Accordingly, this claim is dismissed.

## IV.  CONCLUSION

Based on all of the foregoing, the Court hereby

**ORDERS** that Defendant The City of Houston's Motion to Dismiss (Document No. 44) is **GRANTED**.  The Court further

**ORDERS** that this case is **DISMISSED**.  The Court further

**ORDERS** that all other relief not expressly granted herein is **DENIED**.

This is a **FINAL JUDGMENT**.

SIGNED at Houston, Texas, on this ___25___ day of July, 2012.

DAVID HITTNER
United States District Judge